# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **CHARLES C. FISKE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Civil Action No.** |
| **v.** ) | **07-cv-40174-FDS** |
| ) | |
| **SANDVIK MINING and CONSTRUCTION** ) | |
| **USA, LLC,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM AND ORDER ON DEFENDANT'S SECOND MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

**SAYLOR, J.**

This is a product liability action arising out of an accident involving a well-drilling rig. Plaintiff Charles C. Fiske was severely injured by an allegedly defective drill rig manufactured by Driltech, Inc., the corporate predecessor of defendant Sandvik Mining and Construction USA, LLC. Subject matter jurisdiction is based on diversity of citizenship.

Fiske is a former Massachusetts resident, suing in a Massachusetts court based on an accident that occurred in Massachusetts. Fiske currently resides in California. Ordinarily, such a case would present no jurisdictional issues. Here, however, the product at issue was neither manufactured nor sold in Massachusetts. Instead, the rig was manufactured by Driltech in Florida and sold new to a customer in Minnesota; it arrived in Massachusetts as a piece of used equipment, after several intervening sales. The issue presented is whether Sandvik, as the successor to Driltech, is subject to personal jurisdiction in this Court.

Sandvik originally moved to dismiss the case on grounds of lack of personal jurisdiction

pursuant to Fed. R. Civ. P. 12(b)(2) on August 24, 2007.  The motion was denied without

prejudice to its renewal, allowing the plaintiff an opportunity for jurisdictional discovery.  *Fiske v.*

*Sandvik Mining & Constr. USA, LLC*, 540 F. Supp. 2d 250 (D. Mass. 2008).  That discovery has

been completed, and Sandvik has renewed its motion to dismiss.  For the reasons set forth below,

the motion will be granted.

I.      **Background**

        A.      **Plaintiff's Injury**

        Charles C. Fiske is a current resident of Big Oak Valley, California.  In 2004, Fiske

resided in Rutland, Massachusetts.  On August 6, 2004, he went to property at 233 Pleasantdale

Road in Rutland, where employees of Welltech Corporation were performing a well-drilling

operation for a single family home to be constructed on the site.  Fiske held a private mortgage on

the property, and he was checking on the status of the well-drilling project.  Fiske was standing

near the operating drill rig and conversing with a Welltech employee, John Wentworth, when a

20-foot long, 400-pound iron drill rod ejected from the rig, striking Fiske and knocking him to the

ground.  Fiske suffered severe injuries that left him a paraplegic requiring around-the-clock care.

        B.      **The Drill Rig**

        The drill rig at issue is a D40K model that was originally manufactured by Driltech in

Florida in 1978.  The rig was sold by Driltech in 1978 to North Star Pipe & Supply Company in

Minnesota.  At some point in 1978 or 1979, North Star sold the rig to ICOS Corporation of

America in New York.  ICOS apparently purchased the rig to be used on a job site in Missouri,

and then sent it to its equipment yard in New Jersey.

        In 1993, John Wentworth, the president of Welltech, learned from an unidentified

2

individual that ICOS was willing to sell the rig.  The individual told Wentworth that the rig was

sitting in a field in New York.  According to Wentworth, this individual was not associated with

Driltech in any way.  Wentworth purchased the rig in 1993 and moved it to Sterling,

Massachusetts.  When Wentworth purchased the rig, he was informed that several modifications

had been made to the drill rig by ICOS so that it would perform angle drilling and drilling for tie-

back rods.  Among other things, a safety hoop on the mast of the drill rig had been removed.[1]

    After purchasing the rig, Wentworth occasionally purchased parts for it that had been

manufactured by Driltech from the Rotary Drilling Equipment Company in Scranton,

Pennsylvania.  As described below, Rotary Drilling was an independent, non-exclusive dealer of

drill machinery and parts.  In January 2005, Sandvik purchased the assets of the Rotary Drilling

Equipment Company.

> ### C.      Commercial Activity in Massachusetts

**1.      Driltech**

    As noted, Driltech manufactured the drill rig at issue in 1978.  Driltech was a Delaware

corporation with a principal place of business in Florida.  It never (1) maintained an office, facility

or mailing address in Massachusetts; (2) owned or leased any real property located in

Massachusetts; (3) maintained a telephone number in Massachusetts; (4) had any bank accounts in

Massachusetts; (5) advertised in periodicals or media specifically directed at residents of

Massachusetts; or (6) registered to transact business in Massachusetts.  However, from 1978 to

1990, Driltech employed a customer service representative, Charles Clark, who resided in

---

[1] *See* Declaration of John D. Wentworth at ¶ 9, Ex. C.

Massachusetts and worked throughout the Northeast.[2]

Driltech primarily sold products through dealers.  It conducted the majority of its sales to Massachusetts customers through Rotary Drilling, an independent equipment distributor.[3]  From 1984 through 2004, Driltech's direct sales in Massachusetts represented 0.0601% of its total sales.  Exhibit H, the "Sales Chart," shows the total sales, sales to Massachusetts, and the percentage of sales made to Massachusetts for Driltech, from the years 1984 to 2004.[4]  From 1984 to 1998, Driltech made $478,361 in direct sales to Massachusetts customers.  Driltech had no direct sales in Massachusetts in the years 1986, 1987, 1988, 1990, 1991, 1992, 1995, 1998, 2001, and 2004.  The highest percentage of total sales made to Massachusetts in any given year from 1984 to 2004 was in 1984.  That year, Driltech's total sales were $37,933,025, of which $336,234, or 0.8863%, were in Massachusetts.

Sometime in the 1980s, a Driltech employee visited customers to assist with "start-up" for rigs sold by Rotary to Massachusetts customers.  In the late 1990s, a Driltech customer service representative visited a customer in Massachusetts who was having problems with a drill.  From 1984 to 2004, a Driltech representative attended the New England Water Well Show in Marlborough, Massachusetts, to assist Rotary in the sale of its products.  Driltech did not sell equipment, quote prices, or rent booth space at the show, but sometimes brought customer rigs for display, which would afterwards be delivered to the customer.  Also, Driltech sold equipment

---

[2]  *See* Declaration of John R. Walsh at 12-13, Ex. F.

[3]  *See* Gerald J. Sherman Dep. at 117, Ex. G.

[4]  The chart includes totals for Driltech, Inc., from 1984-1998; Driltech Mission, LLC, from 1998-2004; and Sandvik Mining and Construction USA, LLC, from 2005-2007.

4

that was ultimately sold in Massachusetts to Rotary and provided invoices for those sales.[5]

## 2.    Rotary Drilling

The Rotary Drilling Equipment Company was the distributor for Driltech water well drilling equipment in the Northeast territory.  It was an independent and non-exclusive dealer based in Scranton, Pennsylvania.

Between 1984 and 2004, Rotary sold an estimated average of one drill rig per year to a Massachusetts customer.  Rotary also sold approximately $30,000 in spare parts to Massachusetts customers from 2001 to 2004.[6]  Rotary did not have any employees or offices in Massachusetts. When a Massachusetts customer purchased a new rig, Rotary would send an employee to the customer's place of business to assist with "start-up" and orientation.[7]

From 1984 to 2004, Rotary rented booth space and displayed Driltech products at the New England Water Well Show in Massachusetts.  When speaking with potential customers, Gerald Sherman, the owner and founder of Rotary, would say, "I am Jerry Sherman from Rotary Drilling Equipment, we represent Driltech."[8]

## 3.    Sandvik

On December 12, 2004, Sandvik Mining and Construction USA, LLC, purchased the assets of Rotary Drilling.  In 2005, Driltech, Inc., and another company, Driltech Mission LLC, were consolidated into Sandvik.

---

[5] *See* Sherman Dep. at 50-52.

[6] Rotary's records for the sales of Driltech parts prior to 2001 no longer exist.

[7] *See* Sherman Dep. at 113-114.

[8] *See* Sherman Dep. at 124.

Sandvik is a Delaware limited liability company with a principal place of business in Florida.  It has never (1) maintained any office, facility, or mailing address in Massachusetts; (2) maintained a telephone number in Massachusetts; (3) had any bank accounts in Massachusetts; or (4) advertised in periodicals or media specifically directed at residents of Massachusetts.[9]

On February 4, 2002, Sandvik entered into a Distributor Sales and Service Agreement with Equipment, Erection, Sales & Service Company, LLC ("EESSCO").[10]  In 2007, 103 sales by Sandvik to EESSCO were shipped directly to Massachusetts customers.[11]

Unlike Driltech, Sandvik registered with the Secretary of the Commonwealth to do business in Massachusetts on July 15, 2005.  On February 15, 2007, Sandvik obtained a resident agent for service of process in Massachusetts, the CT Corporation System.

Massachusetts is part of Sandvik's Northeastern territory, which extends from Kentucky to the Canadian border and from Wisconsin to the Atlantic Ocean.  In 2005, Sandvik had one employee who resided in Massachusetts for part of the year.  That employee performed services for Fintec, an Irish company related to Sandvik AB in Sweden.[12]  Currently, Sandvik has an Area Manager (Wes Vietmeier) and a Salesman (Randy Lingenfelter) for the Northeastern territory. From 2005 to 2007, Vietmeier made two or three courtesy visits to Rollins Well Drilling in

---

[9]  Sandvik advertises in national drilling publications, including the National Driller Magazine, the National Ground Water Association Journal, and the Mining Journal.  Sandvik also publishes a national publication called "Blueprint," which is directed at Sandvik's dealers and is distributed quarterly or semi-annually from Sandvik's offices in Georgia, and a catalog that is distributed to its dealers.  Five businesses in Massachusetts are on Sandvik's mailing list to receive "Blueprint."

[10]  See SMC 00541-00566

[11]  See SMC 01942-02210.

[12]  *See* Walsh Dep. at 13-14.

Boxford, Massachusetts, and prepared a quote for Holdgate Well Drilling in Nantucket, Massachusetts.[13]  In 2007, Lingenfelter made eleven sales of parts to Rollins Well Drilling; he delivered the parts to Rollins in Boxford on six different occasions.  Lingenfelter also dropped off brochures and his business card to Connecticut Valley Artesian in Longmeadow, Massachusetts, during the week of June 11th, 2007.[14]  Sandvik also employs Jack Poirier as a salesman for MGT products.  He sells picks and tooling for road construction work in a territory that includes Massachusetts.[15]

In 2005, after Rotary's assets were purchased by Sandvik, the president of Rotary, Randy Sherman, began working for Sandvik as an independent consultant.  He contacted Rotary's former customers, including those in Massachusetts, in an attempt to generate business.[16]

Like Rotary, Sandvik attended the New England Water Well Show in Massachusetts in 2005, 2006, and March 2007.  Vietmeier and Lingenfelter attended the show, along with a product line manager and well specialist.  Sandvik displayed a drill rig and promotional materials. No sales were made at the show.

In 2006, Sandvik filed a tax return in Massachusetts showing tangible property in the amount of $136,846.  The return was filed because Ace Wells and Pumps, located in Rhode Island, had leased property from Sandvik and was using it on a project located in Massachusetts.

---

[13]  *See* Wesley R. Vietmeier Dep. at 65-6, Ex. M.

[14]  *See* Randy Lingenfelter Dep. at 37, Ex. L.

[15]  *See* Vietmeier Dep. at 80-81.

[16]  At the time of his deposition, Mr. Sherman could only remember contacting the following Massachusetts companies:  Rollins Well Drilling, Ogden Well Drilling, Connecticut Valley Artisan, and Hydrosystems.  *See* Sherman Dep. at 105.

That was the only year that Sandvik filed a tax return in Massachusetts.

In 2005, Sandvik's total sales were $360,189,512, of which $2,694,893, or 0.7481%, occurred in Massachusetts.  In 2006, Sandvik's total sales were $415,601,409, of which $2,152,996, or 0.5180%, occurred in Massachusetts.  In 2007, Sandvik's total sales were $423,950,000, of which $321,448.31, or 0.0758%, occurred in Massachusetts.[17]

Sandvik ships its drill rig products F.O.B. from its facility in Alachua, Florida.

### D.       Present Claims

On June 19, 2007, Fiske filed the present action against Sandvik, alleging negligence (Count I), breach of implied warranty of merchantable quality and/or fitness for a particular purpose (Count II), and unfair and deceptive acts or practices in violation of Mass. Gen. Laws ch. 93A §§ 2, 9 (Count III).  Among other things, the complaint alleges negligent design and negligent marketing, sale, and distribution based on a failure to warn.  Sandvik has moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(2) based on lack of personal jurisdiction.

## II.    Analysis

### A.       General Principles of Personal Jurisdiction

The exercise of personal jurisdiction over a defendant must be both authorized by statute and consistent with the due process requirements of the United States Constitution.  *Good Hope Indus., Inc., v. Ryder Scott, Co.*, 378 Mass. 1, 5-6 (1979); *Nowak v. Tak How Inv., Ltd.*, 94 F.3d 708, 712 (1st Cir. 1996); *Intech, Inc., v. Triple "C" Marine Salvage, Inc.*, 444 Mass. 122, 125 (2005).  Furthermore,

A district court may exercise authority over a defendant by virtue of either general

---

[17]   See Sales Chart, Ex. H.

8

> or specific jurisdiction.  Specific jurisdiction exists when there is a demonstrable
> nexus between a plaintiff's claims and a defendant's forum-based activities.
> General jurisdiction exists when the litigation is not directly founded on the
> defendant's forum-based contacts, but the defendant has nevertheless engaged in
> continuous and systematic activity, unrelated to the suit, in the forum state.

*United States v. Swiss American Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001) (citations and

quotations omitted).

The plaintiff bears the burden of showing that the court has personal jurisdiction over the

defendant.  *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 50 (1st

Cir. 2002).  A district court faced with a motion to dismiss under Rule 12(b)(2) may choose

among several methods for determining whether the plaintiff has met its burden: the "prima facie"

standard, the "preponderance-of-the-evidence" standard, or the "likelihood" standard.  *Id*. at 50-

51 & n.5.  The "most conventional" and "most commonly used" of these methods is the "prima

facie" standard.  *Id.* at 51; *Foster-Miller, Inc., v. Babcock & Wilcox Can.*, 46 F.3d 138, 145 (1st

Cir. 1995); *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675 (1st Cir. 1992).

In conducting that analysis, the court is required to take specific facts affirmatively alleged

by the plaintiff as true (whether or not disputed) and "construe them in the light most congenial to

the plaintiff's claim."  *Massachusetts School of Law at Andover, Inc., v. American Bar

Association*, 142 F.3d 26, 34 (1st Cir. 1998).  The court then "add[s] to the mix facts put forward

by defendants, to the extent they are uncontradicted."  *Daynard*, 290 F.3d at 51.  The prima facie

method is appropriate here because the jurisdictional inquiry does not involve materially

conflicting versions of the relevant facts.  *See Foster-Miller*, 46 F.3d at 145-146 (describing the

preponderance-of-the-evidence and likelihood standards).

It is settled law that contacts after the tort occurred, but prior to the filing of the suit,

may be considered in determining if there is general jurisdiction.  *Harlow v. Children's Hosp.*, 432 F.3d 50, 64-65 (1st Cir. 2005).  However, contacts that occurred after the filing of the suit may not be considered.  *Id.*  The relevant forum-based contacts, therefore, are those which the defendant had in Massachusetts prior to June 19, 2007.

### B.      General Jurisdiction

Plaintiff does not presently argue for the existence of specific jurisdiction.  *See* Mass. Gen. Laws ch. 223A,§ 3(c); *Fiske v. Sandvik Mining & Constr. USA, LLC*, 540 F. Supp. 2d 250, 254 (D. Mass. 2008).  Instead, plaintiff contends that general jurisdiction over Sandvik exits under Mass. Gen. Laws ch. 223A,§ 3(d).

General jurisdiction "exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nonetheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state."  *Mass. School of Law*, 142 F.3d at 34; *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 138-39 (1st Cir. 2006).  There are two aspects to the inquiry:  the assertion of jurisdiction must be both authorized by statute and consistent with the requirements of due process.

### 1.      The Long-Arm Statute

The Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A, § 3(d), states in relevant part:

> A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's . . .
>
> (d)      Causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this

commonwealth.

Section 3(d) is the statutory authorization for the assertion of general personal jurisdiction in Massachusetts.  *See Noonan v. Winston*, 135 F.3d 85, 92-93 (1st Cir. 1998); *Landmark Bank v. Machera*, 736 F. Supp. 375, 384 (D. Mass. 1990).

There is no question that the first requirement of § 3(d) has been met—plaintiff alleges that he suffered a tortious injury caused by an act or omission outside the commonwealth. Defendant contends, however, that plaintiff cannot satisfy the second requirement, as it does not "regularly [do] or solicit business" in, engage in "any other persistent course of conduct" in, or derive "substantial revenue" from Massachusetts.

Section 3(d) is to be construed "extremely broadly."  *Noonan*, 135 F.3d at 92. Additionally, the phrase "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth" is disjunctive—only one of its prongs need be satisfied to find statutory authorization for personal jurisdiction.  *Id.*  The question here is whether plaintiff can satisfy either the first or third prong.

The first prong requires that the plaintiff establish that the defendant "regularly does or solicits business" in the Commonwealth.  The third prong requires that the defendant derive "substantial revenue from goods used or consumed or services rendered" in Massachusetts.  The product at issue does not have to be necessarily sold in Massachusetts, or to Massachusetts customers, if substantial revenue is derived from goods that are used in Massachusetts.  *See*

11

*Merced v. JLG Industries, Inc.*, 193 F. Supp. 2d 290, 293 (D. Mass. 2001).[18]   Because the

Massachusetts long-arm statute is intended to extend to the limits allowed by the United States

Constitution, the Court will simply fold the inquiry under the long-arm statute into the

constitutional analysis.  *See "Automatic" Sprinkler Corp. of Am. v. Seneca Foods Corp.*, 361

Mass. 441 (1972) (the Massachusetts long-arm statute is "an assertion of jurisdiction over the

person to the limits allowed by the Constitution of the United States"); *Daynard*, 290 F.3d at 52;

*Massachusetts Institute of Tech. v. Micron Tech.*, 508 F. Supp. 2d. 112, 122 (D. Mass 2007).

2.   <u>Due Process</u>

Assuming that at least one of the requirements of the long-arm statute has been satisfied,

the Court must determine whether the exercise of general personal jurisdiction would satisfy the

Due Process Clause of the Fourteenth Amendment.  To exercise personal jurisdiction in

conformance with the Due Process Clause, two criteria must be satisfied.  First, there must be

"continuous and systematic general business contacts" between the foreign defendant and the

forum.  *Swiss American*, 274 F.3d at 618 (*citing Helicopteros Nacionales de Colombia, S.A. v.*

*Hall*, 466 U.S. 408, 416 (1984)).  This test "is considerably more stringent than that applied to

specific jurisdiction questions." *Swiss American*, 274 F.3d at 619 (*citing Noonan v. Winston Co.*,

135 F.3d 85, 93 (1st Cir. 1998)).  Second, plaintiff must show that the "exercise of jurisdiction

would be reasonable."  *Swiss American*, 274 F.3d at 619.  That inquiry is based on various so-

called "gestalt" factors used to determine the fundamental fairness of exercising jurisdiction.  *See*

---

[18] The First Circuit, however, has rejected a "stream of commerce" theory of personal jurisdiction—that
is, the theory that because defendant placed its product into the stream of interstate commerce, knowing that it
would end up in Massachusetts, it undertook action that was purposefully directed at Massachusetts.  *See*
*Rodriguez v. Fullerton Tires Corp.*, 115 F.3d 81, 85 (1st Cir. 1997) (*citing Asahi Metal Indus. Co. v. Superior Ct.*,
480 U.S. 102, 107 (1987)); *Killion*, 421 F. Supp. 2d at 257.

12

*Donatelli v. National Hockey League*, 893 F.2d 459, 465 (1st Cir. 1990).

### a.    "Continuous and Systematic" Contacts

The evidence of "continuous and systematic general business contacts" with Massachusetts by defendant may be summarized as follows:

(1)    from 1984 to 1998, Driltech made $478,361 in direct sales to Massachusetts customers, ranging annually from a low of $0 (1986, 1987, 1988, 1990, 1991, 1992, 1995, 1998, 2001, and 2004) to a high of $336,234 (in 1984, representing 0.8863% of total sales);

(2)    from 1978 to 1990, Driltech employed a customer service representative who resided in Massachusetts;

(3)    between 1984 and 2004, Rotary sold an average of one drill rig per year to a Massachusetts customer;

(4)    from 1984 to 2004, Rotary rented booth space and displayed Driltech products at the New England Water Show in Marlborough, Massachusetts;

(5)    in 2005, after Rotary was purchased by Sandvik, Sherman contacted some of Rotary's old customers in Massachusetts in an attempt to generate business;

(6)    Sandvik had total sales in Massachusetts in 2005 of $2,694,893 (representing 0.7481% of total sales); in 2006, $2,152,996 (representing 0.5180% of total sales); and in 2007, $321,448.31 (representing 0.0758% of total sales);

(7)    Sandvik registered to do business in Massachusetts in 2005;

(8)    Sandvik obtained a resident agent for service of process in Massachusetts in 2007;

(9)    Sandvik filed a tax return in Massachusetts in 2006;

(10)     a Sandvik employee lived in Massachusetts for part of 2005;

(11)     from 2004 to 2007, Sandvik attended the New England Water Show;

(12)     between 2005 and 2007, Sandvik's area manager made two or three visits to a customer in Boxford, Massachusetts;

(13)     in 2007, Sandvik's salesman made eleven sales of parts to a Massachusetts customer, and delivered the parts on six occasions; and

(14)     EESSCO made 103 sales of Sandvik products in Massachusetts in 2007.

Some of those facts are essentially irrelevant to the jurisdictional analysis.  Sales by independent distributors, such as Rotary and EESSCO, are not normally considered as part of the general jurisdiction analysis.  *See Cambridge Literary Prop., Ltd. v. W. Goebel Porzellanfabrik G.m.b.*, 295 F.3d 59 (1st Cir. 2002).  In order to consider the in-forum sales of an independent agent in determining whether the alleged principal is subject to general jurisdiction in the forum, the principal must exercise substantial control over the agent.  *Killion v. Commonwealth Yachts*, 421 F. Supp. 2d 246, 257 (D. Mass. 2006) (citing *Donatelli*, 893 F.2d at 468).  Without substantial control over the agent, a principal cannot be found to have purposefully availed itself of a forum based solely upon the unrelated systemic and continuous contacts of that agent.  *See Danyard*, 290 F.3d at 55.  Because there is no evidence that the defendant exercised substantial control over either Rotary or EESSCO during the relevant time period, the activities of those agents cannot be used to gain general jurisdiction over the defendant.[19]

_____

[19] Registering to do business in a state and naming an agent of process in a state are factors to be considered in the jurisdictional analysis, but they are not sufficient, standing alone, to constitute the actual conduct of business in the forum state.  *See Sandstrom v. ChemLawn Corp.*, 904 F.2d 83, 90 (1st Cir. 1990) (holding that a company that registered to do business and hired an agent of process in a state was only preparing to do business in a forum and not actually doing business in that forum).  A company that merely registers to do business in a state

What remains is a relatively small constellation of facts that reflect, in substance, only sporadic contacts with Massachusetts. Among other things, Sandvik (or its predecessors) only made direct sales to Massachusetts customers in 13 of the 23 years preceding the filing of this action, and when it did so, sales were intermittent and constituted only a small percentage of overall sales. Furthermore, its business operations in the state were very small, consisting principally of occasional sales and marketing efforts.

Those contacts, taken as a whole, are not enough to satisfy the jurisdictional requirement of "continuous and systematic" business contacts. *See, e.g., Noonan*, 135 F.3d at 93-94 (finding no general personal jurisdiction where a foreign corporation conducted regular and targeted business solicitations of Massachusetts companies, raised approximately $585,000 worth of business, and sent an employee into the forum to conduct work-related activities); *Donatelli*, 893 F.2d at 469 n.8; 470 (finding no general personal jurisdiction where for ten years the NHL provided league officials for exhibition hockey games, conducted scouting, provided television broadcasts, and sold products bearing the NHL logo in the forum state); *Glater v. Eli Lilly & Co.*, 744 F.2d 213, 216-217 (1st Cir. 1984) (finding no general personal jurisdiction where a foreign corporation advertised in trade journals that circulated in the forum, employed eight full-time sales representatives to work in the forum state, and sold products to wholesale distributors in the forum state); *Seymour v. Parke, Davis and Co.*, 423 F.2d 584 (1st Cir. 1970) (finding no general personal jurisdiction where a foreign corporation advertised in the forum and employed several

---

and hires and an agent for service of process, without other more overt actions specifically targeted at a state, cannot be said to have continuous and systematic contacts with that state. *Cf. MIT.*, 508 F. Supp. 2d. at 122 (finding general jurisdiction where a company was holding itself out as doing business in Massachusetts when, in addition to having registered to do business in Massachusetts and naming an agent for service of process in Massachusetts, it stated on its website that it had a sales office that services Massachusetts).

salesmen in the forum state who disseminated product information and took product orders).

In the cases where general jurisdiction has been found, the level of contact has been much higher and much less sporadic. Thus, in *MIT*, the company in question paid thousands of dollars in Massachusetts state taxes every month. *See* 508 F. Supp. 2d at 121. Defendant here has only filed a Massachusetts tax return once— in 2006, when a Rhode Island based company leased property from Sandvik, and used it on a job in Massachusetts. In *MIT*, the defendant's salespeople contacted Massachusetts customers on a weekly basis and maintained a New Hampshire/Massachusetts sales office. *See id.* at 122-23. Here, the defendant's salespeople covered a much larger area (the entire Northeast) and contacted Massachusetts customers less frequently. In *MIT*, the company sent e-mails soliciting business to Massachusetts customers. *See id.* at 122. Here, the defendant engaged in no such practice.[20]

In summary, there is no evidence that defendant had "continuous and systematic general business contacts" with Massachusetts sufficient to meet the minimum requirements for the exercise of jurisdiction, either under the long-arm statute or the Due Process Clause.

**b.   <u>Reasonableness</u>**

Even if the defendant had sufficient minimum contacts to satisfy the first prong, the exercise of jurisdiction over the defendant must be reasonable. In making the reasonableness determination, the court must examine the five "gestalt" factors: (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most

---

[20] The fact that the defendant advertised nationally and those advertisements reached Massachusetts citizens is not sufficient to confer general jurisdiction. *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 376 (5th Cir. 1987); *Polaroid Corp. v. Feely*, 889 F. Supp. 21, 25 (D. Mass. 1995).

effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.  *See*, *e.g.*, *Foster-Miller*, 46 F.3d at 150.  If, in the aggregate, it is unreasonable and unfair to exercise jurisdiction over the defendant then the Court cannot exercise personal jurisdiction.  *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 210 (1st Cir. 1994).  Because defendant did not have "continuous and systematic general business contacts" with Massachusetts, and thus cannot satisfy the first part of the test, it is unnecessary to consider whether the exercise of jurisdiction would be reasonable under the circumstances.

**V.**     **Conclusion**

      For all the foregoing reasons, defendant's motion to dismiss for lack of personal jurisdiction is GRANTED.

**So Ordered.**


                                   /s/ F. Dennis Saylor_____
                                   F. Dennis Saylor IV
Dated:  September 25, 2009          United States District Judge